Good morning. Please be seated. We are here for the embankment argument in Peralta v. Dillard. Council ready? Okay. We'll hear from Appellant. Good morning, and may it please the Court. Derek Milosavljevic from Kirkland & Ellis on behalf of Plaintiff Appellant Cion Adonis Peralta. I'd like to reserve six minutes if I could. I know the Court is primarily interested in the jury instruction that was given by the district court, but Mr. Peralta also appeals two Rule 50 motions that were granted by the district court. Both of these rulings were in error, and neither is dependent upon the propriety of the jury instruction at issue. So if I could, I'd like to address those rulings briefly. The district court's rulings were errors both of fact and law. First, the district court ruled that there was absolutely no evidence that the two defendants, Drs. Dillard and Fitter, had any subjective knowledge of Mr. Peralta's serious medical need. The evidence in this case and the trial record conclusively demonstrates that that's false. In fact, Dr. Fitter, who was the chief medical officer of the Lancaster prison, signed off on Mr. Peralta's 602 complaint in November of 2004. Now, he testified that he carefully reviewed that complaint, and that complaint, which is at excerpts of Record No. 11, conclusively demonstrates that Mr. Peralta complained of serious pain, severe pain, three times. Now, Dr. Fitter, while not a dentist, was a medical doctor, and severe pain in and of itself, and the risk of future harm by that severe pain is enough to demonstrate a serious medical need that Dr. Fitter ---- Sotomayor, all pain? Pardon me? All pain? Severe pain. And I think ---- All severe pain? A serious medical need? Yes. I'm just wondering. I think so, Your Honor. I have a question about the testimony that was carefully reviewed. My understanding is that the form came without any dental record attached. Is that right? It's true that Dr. Fitter testified that he did not review the detailed dental records. However, he did review, and he said he carefully reviewed the appeal itself. So my question is a little bit different, counsel. I want to know what was presented to him. So I'm just asking whether or not or do we have testimony about whether the form came with the dental records? It didn't. I can tell you that, Your Honor, that it did not come with the dental records. It came with what you see at Excerpt 11, which is simply Mr. Peralta's complaints and the responses or the signatures from the treating physicians or dentists. And so he knew at the time that he signed this that two dentists, one had seen Mr. Peralta, had seen the patient, and the other one had reviewed the record and indicated that the treatment was appropriate. Well, one had reviewed the record. One had seen him. But what he knew was that the treatment for the pain was at most a few-day supply of ibuprofen. But what you're you have to establish this record has to establish that he was deliberately indifferent to your client's situation. And I'm wondering how you can establish that in a circumstance where he knows your client was seen by someone who thought the appropriate treatment was a few days of ibuprofen, perhaps incorrectly, and that that record had been reviewed by another treating dentist who thought that was the appropriate method of treatment. How can the third-level person then be deliberately indifferent? Well, Your Honor, I think it was only one dentist who reviewed the records. Right. And by treating dentist or reviewing dentist, and then it comes up to? Well, the treating dentist and the reviewing dentist were the same dentist. Okay. Treating dentist, another review by a medical officer, and then up to third. This is the third level, is it not? No, Your Honor. It's the second-level response. So what we had was Mr. Peralta complained, finally got seen by Dr. Brooks, who was the treating dentist. It's the third level of appeal. But my point is that he was seen by this officer knew that he was seen by a dentist who prescribed a certain course of action. Why does that make this officer deliberately indifferent to your client's situation? Well, Your Honor, I think it's fair for the jury to have been able to draw the inference that from reading this appeal in and of itself, and from Dr. Fitter's testimony that severe pain was a serious condition, that he knew of Mr. Peralta's complaints and failed to adequately respond. And I think that under Jett v. Penner, this Court has determined that when a prison official knowingly fails to respond to an inmate's cry for help, he can be deliberately indifferent. And so certainly the jury could have decided that you're lying entirely on the pain, which gets back to my original question. I mean, it's all pain, the note. I mean, people live with pain all the time. People live with pain for years and years and years. I mean, pain that you can't do anything about. So what it sounds to me like you're trying to derive is from the fact that he says I'm in pain, the fact that the doctor didn't do anything, even after he reviews it, he knows dentists have looked at him and there's been another review, that that in and of itself is enough to go to a jury, and I'm just not sure where you get that. Well, first of all, I think that there's testimony in the record from Dr. Fitter that severe pain is a serious medical condition. And so when left untreated, I think yes, Your Honor. I think the case law agrees that severe pain --- Well, it was not left untreated. He got IV for a fulminant. Well, five days of ibuprofen. But he was left on the waiting list for nine months to a year. Well, he was left on the waiting list for an extraction, correct? No. He was placed- He was placed on a list for an extraction. He was placed on a list for extraction. That's true. But with respect to treatment, he saw a dentist before a year passed. No.  For the purposes of that extraction. One extraction, although he complained of multiple teeth. But at the time the complaint came up to the chief medical officer, hadn't this -- hadn't your client already been seen by a dentist who prescribed three or five days of ibuprofen, correct? Well, Your Honor, he had been seen by a dentist, but he was not examined by that dentist. I understand. I understand you have complaints about the dentist, but I'm trying to figure out why the reviewing officer, who sees that your client has a complaint, who sees that he was seen by a dentist, who sees it, says that the dentist says the appropriate treatment is to give him ibuprofen and perhaps to remove a tooth later, which never needs to be removed. I'm trying to figure out why that makes this reviewing officer indifferent to your client's situation. Well, for one, Dr. Fitter testified that the purpose of the review that he conducted was to determine whether the prior treatment examination was appropriate. He testified that he was unable to do that on himself. He would have to rely on the chief dental officer. I think I'm asking the same question. Okay. So why does reliance on one of your officers' diagnosis make you indifferent? If the officer had said, I'm not going to see him because I don't like prisoners, then it seems to me on review the chief of the reviewing officer is indifferent. But why? Why does it make him indifferent? Okay. Perhaps there's some confusion. He did not rely on the dental officer. The dental officer did not review that appeal. He signed off on it knowing that Dr. Dillard, the chief dental officer was not there. I understand the intermediate guy was gone. We're talking past each other here. The examining dentist had already seen your client, correct? Yes, Your Honor. And he said he's got this problem. I think the appropriate treatment for it is ibuprofen and eventually extraction. Extraction never occurs later because they all decide it's not necessary. The complaint then comes up to the reviewing officer who looks at what the person has done and says, that seems reasonable to me. Why is he indifferent under those circumstances to your client's situation? Well, he's indifferent if he doesn't give it a meaningful review. There has to be some purpose behind the second-level review. And what makes you think that he didn't give it a meaningful review? I mean, what evidence is there that he didn't give it a meaningful review? Well, I think it's his own. What can he do other than look at it? And if he sees that he's been examined, looks like appropriate treatment, I mean, you know, what else can he do? Well, what he can do is wait until a qualified dentist was able to review that first examination. And he testified that that was his normal practice. But in this case, because he had to get the appeal out, he decided to just not follow his normal practice. In this case, he knew that Dr. Dillard was not around and for whatever reason had not signed the 602 form. He knew that Dr. Kassim had signed the 602 form, and he knew Dr. Kassim was absolutely unqualified. So maybe that's another reason on his part. Where is that deliberate indifference? Where do you get deliberate indifference? I think he knew. I mean, he had an appeal time that he had to act on, right? It's not like he did it because he was lazy or he was gone fishing or something like that. He had a reason to do it, and that was he had an appeal pending. And I think that's a deliberately indifferent reason to do it. It's a nonmedical reason for denying or delaying treatment. And I think he also clearly, to me, failed to respond to an inmate's request for help. Now, so your only argument, as I understand it, is that there was a jury question. You're not asking for judgment on your behalf as a matter of law. That's right. I'm just saying that there is a permissible set of inferences that would have allowed a finder of fact to draw the conclusion that you're seeking. That's absolutely right. Well, that's right. That's why I was asking what those inferences would be. Well, that he knew that he knew. I mean, this he knew there was a jury question. I mean, inferences that would lead to a finding of deliberate indifference. Yes. But I think there's someone who had a question. Yeah. Unlike Dr. Fitter, Dr. Brooks got to the jury, right? The case went to Dr. Brooks. As I understand the instruction that was given, the jury was told that they should consider everything Dr. Brooks did and what he reasonably could have done. Why isn't that an appropriate instruction? Well, they could have ruled for your guy against Dr. Brooks. The jury was told that it must consider the resources available to Dr. Brooks. And why isn't that correct? I think that's a misstatement of the law. Well, I think that's a misstatement of the instruction, because the instruction doesn't stop there. It says that they must consider the resources that are available or which the person could reasonably obtain. So if you look at that as a whole, a person would not be deliberately indifferent if they — it just seems to me — well, let me just back up. If an individual dentist or doctor does not have resources and cannot reasonably obtain those resources, which is what this instruction talks about, how can that person be deliberately indifferent by not using the resources that he neither has nor can he obtain? Well, First Your Honor, it's either at the very least confusing when it says that it must be considered in the context of the personnel, financial, and other resources available. But — But it doesn't stop there. That's my problem. The way that you've argued this case, it appears that the instruction stops halfway through, because they're not responsible if they don't have the resources or they can't obtain them. So it puts some requirement that they try, which seems to me very favorable to your client. Well, here's one of the main problems with this instruction. It adds an element to the claim. And essentially, now what you're looking at is a — we're usually talking about going to have to seek and get discovery into the resources available to each and every defendant every time a plaintiff — Well, no. It seems to me that it's — it's merely a context for when is a person deliberately indifferent. If — if you want X-rays and there's no X-ray machine and they've asked and they can't get one, how is it deliberately indifferent not to have one? I guess I just have difficulty because of the subjective component that if the person does not have the ability to do it because of a lack of resources and they can't get those resources, I don't know where deliberate indifference can come in. Well, for one thing, those aren't the facts of this case. You're — you're asking us to say that this instruction is erroneous as a matter of law, so that's what I'm asking you about. Well, an instruction is erroneous when it's either a misstatement of law, it's confusing, or it lacks foundation in the evidence. And in this case, it absolutely lacks foundation in the evidence. Well, let me ask you this way, counsel. Let's assume that the court did not give this particular instruction and the remaining instructions were given. To what extent, in your mind, can the defendants argue the evidence that was presented in this case to say, look, I wasn't deliberately indifferent because look at the situation that I had to deal with, the ratio of staff to inmates, the demands, the lack of resources, can — can the defense stand up in closing and argue all of those inferences that came out of the facts? I don't think so. I think that in the case of medical deliberate indifference, any delay or denial of treatment for a non-medical reason, in this case it would be because I was busy, because I was overworked, because there wasn't enough staff, I think is an improper reason for denial of care. And so I don't think, and I don't think Wilson v. Sider says otherwise. I'm sorry. Where do you get that from? Which, Your Honor? That any reason, like unavailability of medical — Well, I — Where do you get that from? I think that — I know that sitting on bunk, you can, if you decide to — I'm just asking you a question. I think that Snow v. McDaniel — Why don't you answer the question I asked you? I mean, what are you relying on? I think Snow v. McDaniel stands for the proposition that evidence of denial of care or delay of care for a non-medical reason supports an inference of deliberate indifference. And I think — Has Snow dealt with a lack of resources? Well, no. Well, possibly it dealt with financial. Okay. But so you're right. But it goes to the jury. And the jury hears your inference. You hear — they hear your argument. And the jury says, in effect, this guy did everything he could with what he had to work with. But I don't think it should go to the jury. I think that our prior cases — Well, but how does Snow help you? This is — I think this is what Justice Sibelman is asking you. So you said Snow. And Justice Sibelman says, well, Snow says it goes to the jury on that question. And you lost before the jury. Why — how does Snow help you? It doesn't say that it goes to the jury. It says that finances is not a reason to support summary judgment. It doesn't say you may use finances. My question, counsel, is can the defense argue the context? Because there's a subjective component here. And you have to show that the defendant was aware, subjectively aware, and disregarded the serious medical condition. So couldn't the defense stand up and say, look, I really was not deliberately indifferent. I didn't disregard his serious medical need. I worked with what I had, and so, therefore, my conduct was reasonable. Couldn't they argue those inferences from the evidence that was, in fact, presented in this case? I don't think so. I think that defeats the very purpose of Section 1983. 1983's purpose is to deter State actors from infringing on individuals' federally guaranteed rights. And the second purpose is to compensate those victims when deterrence doesn't work. And so when you make a — What should Dr. Brooks have done? Well, this one's easy. Dr. Brooks should have placed Mr. Peralta on the urgent or emergency list. So the person who gets knocked off the list because your client goes on, does he have a claim against Dr. Brooks? No, absolutely not, Your Honor. There's testimony that we were still — Dr. Brooks was still seeing people on the routine list. If you've got one person who you're aware of a serious medical need, it makes absolutely no sense, and it's not supported by the Constitution, that you're required to see patients on the routine list. Then your argument isn't that you can't consider lack of resources. Your argument is he had the resources to deal with urgent patients, and that argument presumably could have been made to the jury. Well, that's one argument. But I think that when those are the clear facts of the case, and then you present this confusing jury instruction that is without support in the evidence, you may end up with a case where — Your objection to the instruction is not that it's incorrect as a matter of law.  No, Your Honor. I think that this instruction should be struck down. But in the actual case that's before us, I think it was confusing, and I think it was inerrant. So — But I want to — let me ask you about that, because I'm interested in that. As I understand the record in this case, after Dr. Brooks sees your client, he does two things. He prescribes some painkillers, and then he sets a procedure way off in the future. As to that procedure, he says, I can't schedule it sooner because we're all backed up. We don't have the resources to do it. When the procedure rolls around, he and your client decide together that they really shouldn't pull the tooth because it's not infected. So your real claim in this case doesn't have to deal with the delay in that procedure. Your real claim in this case has to do with the absence of treatment between the initial visit and the procedure. Isn't that right? No, Your Honor. I thought this was helpful to you, so don't fight me on it. Well, but I appreciate what you're saying, Your Honor, but I want to be clear that the director's level review at tab 15 in the excerpts of record shows that Dr. Brooks actually did not ever schedule him for urgent treatment. He put him — No, I — we're saying the same thing. So listen. This is a softball. Okay. So wind up and hit it, if you can. It's not the absence of the extraction that you're complaining about in this case, correct? Of course not, Your Honor. It's the absence of other treatment. Absolutely. Is there anything in this record that suggests that resources prevented the absence of other treatment? Absolutely not. In fact, there's testimony from Dr. Dillard that in those three instances where Dr. Brooks had Mr. Peralta in his chair, he could have provided the necessary care. And you could have argued — No, I didn't. It's a fallback argument. You could have argued this to the jury under that instruction. So what's your complaint? Again, the complaint is that the jury instruction is confusing and lacks foundation in the evidence. I'm not confused. What's confusing? Well, when counsel — But Ms. Graber went over it with you and sounded pretty favorable to you. When counsel stands up in closing argument and says that jury instruction number 24, which, by the way, they didn't even propose, jury instruction number 24 is everything to this case, I think it's confusing that you put it before the jury and have them look at it and say — You wouldn't feel that way if you had won under instruction 24. But I think Judge Rolison had a question. I'm sorry. That was my question. I was going to ask you, is your argument that the jury instruction was not supported by the evidence in this case? I absolutely do argue that, Your Honor. How can you argue that? I mean, you know, there was this case. You're disputing the doctor's claim that, look, we didn't have the resources. How is it not supported by the evidence? What is it that the — since you're not complaining about extraction, I think Judge Horwitz already got you to say that, which is right. It seems to me absolutely right. What is it that Dr. Brooks should have done as far as the evidence shows? What should he have done? Well, the experts say that he should have been put on a pain treatment. He should have been examined for cavities. He should have been treated for his infection. And he should have been fully examined. He was never examined until December 2005. A year and a half after he first complained. Is there anything that prevented Dr. Brooks from putting him on the urgent care list? Absolutely no. Nothing prevented that. And Dr. Brooks testified that he needed an urgent care, right? He testified that he did, yet he said otherwise in the actual appeal. Right. When he — well, you said in the actual appeal. Now you're talking about — Well, when I say six — I mean the 602 appeal. I apologize. But that's a judgment call as to whether you put someone on the urgent care list or whether you treat them. And the jury has that. Well, it's a judgment. The jury had the evidence. And you could argue he should have been put on the urgent care list. And that would have been great if they had not also put this jury instruction in front of them that said, also, if we don't have enough resources or there aren't enough people working, you cannot find him to be deliberately indifferent. But I was referring to Justice Kirsten's question. She said there's nothing that prevented him from putting him on the urgent care list. So the instruction — and you said that's right. There's nothing that prevented him from doing that. But he didn't. So how does an instruction that says you have to take resources into account interfere with the argument, but he should have been put on the urgent care list? Why couldn't you argue that to the jury under this instruction? Your Honor, I think that Clem v. I just answered my question. Because it's confusing. It's a confusing jury instruction that is absolutely without foundation in the evidence. Was there evidence in the record that — And that's your answer? You're sticking to it? Yes, Your Honor. I was going to ask you, is there evidence in the record that all of the alternatives that were postulated by the expert, there were resources available for all of those? That's your representation, that there was evidence in the record that there were sufficient resources to accommodate those recommendations? The evidence in the record from the chief dental officer was that in each of the three times Mr. Peralta was in the chair, he could have been provided with routine, urgent, or emergency care. And he was not. That's the evidence from the chief dental officer. So we can rule in your client's favor simply if we find that this evidence was — this instruction was not supported by the record in this case. I think that's right, Your Honor. Without getting to the broader question about whether it would be appropriate in a case in which — in which — in which there was — there was no ability to see him urgently, because there were so many other urgent people ahead of him in line. I think that's absolutely right, Your Honor. Counsel, in the Youngberg case in the Supreme Court, the Supreme Court suggests that budgetary constraints might go to good-faith immunity. What's the status of the qualified immunity claims here? Well, first of all, I think Youngberg was decided in 1982. Wilson v. Sider was decided in 1991. So I think that the question of a good-faith kind of budget defense was more — more recently considered in Wilson. No, but it was punted in Wilson, so it doesn't really help you very much. But maybe you can answer my question as to what is the status of the — of any qualified immunity claims by Dr. Brooks in this case. Well, if they had brought up in the — when they — before trial that there was no clearly established right to care when there's understaffing, I think that would have been a matter for the Court to decide. But that was not brought up there. So is the qualified immunity — has the qualified immunity claim for Dr. Brooks been preserved? I don't think so. If this goes back, does Dr. Brooks still have a qualified immunity claim? I don't think so. I think that needs to be pled as an affirmative defense. Dr. Brooks did not plead it? Not on that grounds. I don't think so. Okay. On any grounds? Pleading qualified immunity. It looks to me like the district court said, I'm not going to consider qualified — you're not entitled to qualified immunity, and just sort of kicked it out of the case. Well, because there's a clearly established right to adequate medical care. From this briefing, though, counsel, it looks like the qualified immunity ruling, if it was a ruling, was a surprise. That's what Judge Bybee is getting at. And we can't tell whether or not it was pled or what your real argument is. Is that your objection, that that was a surprise ruling and qualified immunity hadn't been briefed or argued? Well, yeah. I mean, in the trial record, I don't find anything about qualified immunity. But it doesn't — Until the judge ruled? Until the judge ruled. I think it was brought up in post-trial oral motions. I have a practical question for you, counsel. You have argued in your briefing that it's okay to hold these individual defendants liable because the State is going to step in and indemnify them. That may be true in California, but that's not true in every State in the Ninth Circuit. In Washington, there is a constitutional provision that prohibits the lending of State credit or resources to pay private debts, which would include a punitive damages award. So to go back to the question that was asked of you earlier, what does a reasonable physician do who tries to do everything possible within the constraints? Should we still hold him liable personally in damages? Yes. Absolutely. I think I understand what Your Honor is saying. And right now, Washington may not have that provision. But if the Court rules in the way that I think that it should rule, the 1983 — Constitution. That's right. To adjust to the Ninth Circuit's ruling. I think that's highly unlikely. Well, then, perhaps Washington will need to close down its prisons. And isn't that a workaround the State's immunity from suit? I mean, you know, you can't very well say we're going to stick to the doctor because we know the State will pay for it, because it seems to me that is just a — just a workaround around the State's immunity. There was no claim here. This was a State facility or a county facility or — State facility. State facility. So the compensation here would come from the State. I understand what you're saying, but that — I'm just asking the compensation here, if the doctor is held liable and — From the State, the correctional facility funding, I'm — I can't speak for it. Or insurance, possibly, for the doctors. We have no idea. I can't speak for it. But insurance paid for by the State, this would be the — so can we really do that? Can we really base liability on the doctor by saying, oh, he'll be compensated by this other entity that is immune? Well, it's been done before, Your Honor. That's not before the Court right now. And I, frankly, am not able to speak authoritatively on that. Well, we have a — not only in Washington, but certainly in California, a serious, serious budgetary constraint. I get your point about the Supreme Court, about our jurisprudence in Jones, and so on, about how budgetary constraints should have nothing to do with constitutional deprivation. But as a practical matter, we live in a society where there are some balances involved. Let's say you're in Washington State, you get no indemnity, and let's say that Washington had the kind of budgetary constraints that California has. Why would any sane dentist agree to work in such a situation that you have no resources, and you're not going to be indemnified, you would have ethical problems facing you, and yet you don't control it? You're almost like the prisoner. A prisoner doesn't have any other place to go, but the professional does have a choice whether or not to work there at all. Is it your point that that's just the way it goes? You may be right, Your Honor, and I think that would be just the kind of impetus that would force a change in the prison system. And ---- Is that what underlies this primarily? Fewer dentists, right? That's the kind of change we want, right? No. Maybe more funding for the prisons. I know Governor Brown seems to have created another economic miracle here. Maybe we can send some more money to prisons way. But I think that 1983 is best served when the State is forced to address these to skirt any kind of fiscal responsibility. You're down to a minute and 23 seconds. Thank you, Your Honor. Okay. We'll hear from the appellees. Good morning. Jeanine Jeffrey on behalf of appellees and defendants. I want to correct the record just briefly. We did plead qualified immunity. It is in the pretrial order, so it was preserved, I think. Did you have to file a cross-appeal on that question? I did not. The Court ---- Did you need to? Have you preserved it if you didn't file one? I can't answer that. I don't know. I may not have preserved it. I don't think it's a qualified immunity issue. You're relying, no doubt, on our rule that says we can uphold the judgment below on any basis supported by the record. Yes. Thank you. That's a softball. It's right down the middle. I like this. Can I have some more? Let's just back up to what you just said, though. You think this is not a qualified immunity issue? That's what we heard you say. Yes. And I think that's right. I think this goes to subjective intent. I think the construct of the argument ---- What do we do with the Court's dicta, then, in the Youngberg case? Youngberg's an interesting case. I think that dicta is right on point, but the analysis in Youngberg talks about good-faith immunity, and it doesn't talk about it in the context of what I think we all understand qualified immunity is under Saussure. But it certainly gets the point across. So Youngberg's a little confusing for me in that regard. I think the construct of the argument is that deliberate indifference under the Eighth Amendment requires a subjective intent. In order to evaluate subjective intent, you must look at the constraints facing the individual. That comes right out of Wilson v. Sider. What we did in this case is present to the jury the constraints facing the individual. But I want to ask about that, and I want to follow up on the question I asked your opposing counsel. How was Dr. Brooks constrained in treating the pain component of the complaint? Well, I don't think he was constrained in treating the pain component. He gave the inmate life support. Well, whether or not he was ---- put aside whether he treated the inmate correctly or incorrectly. That's a subject of dispute in the case. My question is how was he constrained by the absence of resources in providing pain treatment to this inmate? Recognizing that the idea that I might pull a tooth eventually went by the wayside and everybody agrees it's not part of the complaint in this case, how was Dr. Brooks prevented by absence of resources from dealing with these complaints? In trying to understand your question, there were a few different complaints. But Dr. Brooks gave him ibuprofen. No, I understand what he did. I understand what he did. So he wasn't constrained not to give ibuprofen. He gave ibuprofen. Well, my question is you wanted the jury to be instructed that Dr. Brooks' subjective intent ought to be considered in the light of the resources available to him. My question is how was he ---- how were the ---- what absence of resources prevented Dr. Brooks from dealing with the specific complaints of pain presented by this patient? The ---- well, maybe it will help you if I ask it a different way. If Dr. Brooks had wanted to prescribe a lengthy course of much more expensive and much more effective pain medication and antibiotics, could he have done that? Yes. Okay. I think that's an answer. That's Judge Hurwitz's question. I have a question on the intent concept. What's your take on the role of farmer about subjective intent? It seems to me that Supreme Court indicated that all you needed to find was knowledge and awareness of a substantial risk of serious harm. Doesn't that undercut the Williams case from another circuit and earlier gloss on the intent issue? No. I think farmer requires a culpable state of mind. I think that the decision is fairly clear. What do you have in farmer that gives that? I think on page 834 of farmer, it states that a prison official must have a, quote, sufficiently culpable state of mind. And farmer also goes on to say in footnote 8 that it's important to instruct the jurors in deliberate indifference cases that the court should be careful to ensure that the requirement of subjective culpability is not lost. But on 842, it talks about intent requires no more than evidence of knowledge or awareness of a substantial risk of serious harm. Doesn't that undercut – well, let me read a little bit more here. Under the test we adopt today, it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. So doesn't that undercut the concept of intent, at least as I understand your suggesting? I don't think it does. I think the courts have universally stated that this is an Eighth Amendment violation. It's not tort. It has to be cruel and unusual punishments, and that has an intent element in it. And once you accept that there's an intent element in the tort, in the constitutional tort, you have to look at the subjective state of mind of the person. Kennedy, but again, that's – but we're talking about tautology here. Well, yes, you have to have a subjective state of mind, but doesn't farmer say that all that's required is knowledge, awareness of the problem? If that's not it, then what is the level of intent required here? Does – in this case, Dr. Brooks, for example, have to have formed in his mind and you have to – or the other side has to prove that he thought to himself, you know, I'm going to really fix this guy Peralta. He's got serious periodontal disease. I'm going to let his jaw just rot right off. Is that what he's got to prove? No. What does he have to prove? As I understand the law, he has to prove wantonness. And the jury was instructed. What? Wantonness, which is something above gross negligence. What does that mean in this context? In this context, it means he has to decide not to treat Peralta for some improper motive. Okay. What's that motive in this case? I don't think there was an improper motive in this case. And I think that's what distinguishes Snowe. The Court earlier asked about Snowe. Snowe is directly an improper motive case. There's evidence in that case. You're arguing an issue that's not in front of us. The case went to the jury. There was – there was – the case went to the jury against Dr. Brooks. You're not arguing on appeal that he should have won as a matter of law. What you're arguing on appeal is that this instruction was appropriate. Yes. So I'm not sure – so I just don't understand why it matters right now what his state of mind was. The question is whether or not the absence of resources is a defense in this case. Isn't that right? The absence of resources goes directly to the issue of state of mind. If you don't have, as the Court said, an X-ray machine, but the inmate needs an X-ray, you can't get him an X-ray, and it doesn't make you have a culpable state of mind, which is what's required. So what you're saying is that I have an X-ray, okay? Let's change the facts of the case just slightly. Let's assume that everybody agrees that the inmate needs treatment. Dr. Brooks comes to see him and says, he needs treatment, but I've got a lot of other people in line in front of him. It goes up the line, and they all say, yeah, there's other people in line in front of him. He has no 1983 claim? I'm sorry. Can you ask me that again? I do not – Sure. Is it your position that if a doctor comes to see the patient and says, oh, my God, he needs treatment, he will suffer terribly unless he gets it, but I'm just too busy to provide it because I have lots of other patients to take care of. There's not enough resources to get to him. So he suffers, and he suffers in a way that the Eighth Amendment prohibits. Does he have a claim against anyone? Well, he has a claim against the doctor. The jury got to decide. No, no. I know. My question is, does he have a valid claim against anyone, under your view of the case? Is there no one he can sue? He can sue. He can't necessarily win, right? Does he have a valid claim against anyone, in your view of the case, on those facts? Under those facts, maybe. Under Government Code 845.6, failure to summon medical care. No, I'm talking about a 1983 claim. Okay. No, is the answer. So that the State of California may put people into prison, not provide sufficient resources to treat them, and then allow the only people who can be sued under 1983, which is to say individuals, to all say, we don't have any money, what do you want? That's your position in the case. I think it is. Perhaps stated more cavalierly than I would say it, but yes. Sotomayor, why wouldn't there be an injunctive claim available against the higher ups in the chain? There absolutely would. I think the standard for injunctive relief is different. I think that the courts have said, if you're going to run a prison, you're going to run it constitutionally. You can have injunctive relief for overcrowding, but you can't sue the individual guard for overcrowding because he has no control. So there could, in this hypothetical, be a valid claim more at a higher level of generality, perhaps. Absolutely. Let me ask you about Dr. Dillard, if I may. If I understand the record correctly, tell me if I got this wrong. After Peralta saw Dr. Brooks, Peralta, the plaintiff, continued to complain about not being treated properly. Is that right? After he saw him the first time? Yeah. Yes. And Dr. Dillard, who is himself a dentist, didn't see fit to go and examine Peralta and didn't see fit to order Peralta moved up on the list. And furthermore, he had somebody who's not a dentist sign off on the appeal. Those are not facts I would adopt. Which facts are wrong? Dr. Dillard had no information about Mr. Peralta until he was served with a complaint. I just asked you, didn't he get a complaint from Mr. Brooks that he didn't like the way he was being treated? I thought you asked me whether Mr. Peralta continued to complain. Well — Dr. Dillard's only role — At any point, did Dr. Dillard, the dentist, ever go see Mr. Peralta? No, he did not. And is it true that he had a non-dentist, some physician who's not a dentist, sign off on the appeal? There are different levels of the appeal. My question is, is that what he did? At the second level, yes. Not at the first level. At the first level, two dentists — Okay. He had some guy who's not a dentist sign on the appeal. Right. Now, just stick with me for — I will. — for a second. Dr. Dillard had the authority to order him moved up on the list but never exercised that authority. Is that also true? I don't believe that's in the record, but I'm sure that is true as the Chief Dental Officer. Now, if that's all true, I don't understand why Dr. Dillard gets kicked out on directed verdict, why it doesn't go to the jury. Dr. Dillard's only role in the entire thing was, after he got served with the complaint, he said, I don't know what this is. Why am I getting sued? But, ma'am, isn't that arguably because Dr. Dillard didn't do his job? Isn't that what opposing counsel is saying? I mean, as a matter of regulation, the level two appeal, per Judge Silverman's suggestion, came to Dr. Dillard as the Chief Dental Officer, right? It did not. Dr. Dillard did not ever see the second level. He didn't see it. That's not my question. He's required to sign off on it as the Chief Dental Officer. Whether he had somebody else sign off on it or not is a different matter. That's Dr. Kaysen that we've just been discussing. But isn't the opposing counsel's position that Dr. Dillard didn't know because he didn't do his job, he didn't review the level two appeal? And that is completely contrary to 1983 law. It's not about the law. But my question, you're not answering my question. I'm sorry. I'll try. Is that the point, that he didn't know because he didn't look at the level two appeal? He didn't know because he didn't look at the second level appeal. Yes, that's true. And isn't there a regulation that requires the Chief Dental Officer to look at the level two appeal? Yes, that's also true. And if he's on vacation or if he's sick or if he's in Washington or if he's someplace else, he can't look at the second level appeal because they have to be turned around in a certain amount of time. And why isn't that a jury question as to what his reason was, what his state of mind was? Because the Title 15 doesn't create a constitutional right. The cases are — there are tons and tons of cases out there that say just because you're involved at a second level appeal doesn't open you up to liability. If we do that, we are going to get so many more lawsuits. So Dr. Dillard is sued. He looks at the complaint. He says, why am I being sued? And then he looks at the dental record. Every inmate in the system from then on is going to sue everybody that they've ever spoken to with the hope that that person is going to be conscientious enough to go to the complaint. And people they haven't spoken to because they might have spoken to them. Right. And that's not what our law is. You can't create a duty on Dr. Dillard independently just by filing a lawsuit against him. And the fact that he's the chief dental officer, there are hundreds of appeals in the system all the time. His job isn't to go through and look at them all. What is his job, in your view? If he's reviewing at the second level, you just said it's not his job to review. I don't understand that. I meant it's not his job to analyze each appeal that he enters. He wasn't involved in this appeal. So he's supposed to rubber stamp them? That's your position? He has a lot of them, and therefore, his review job is too onerous and he shouldn't have to be held to it? No, that's not my position. My position is reviewing appeal doesn't create constitutional liability. Well, once Dr. Dillard is sued and has served in this case and then looks at the medical treatment records, is there a question of fact as to whether or not he should have thereafter acted? I don't think so. The record he looked at was the one piece of paper from Lancaster, and it stated what Dr. Brooks was doing. No, but I'm now asking, he's been sued. There's an allegation I've suffered terrible pain for the last X months. I'm still in the system. You can still remedy this. You can get me treatment, and he doesn't. He's in a position to order treatment, I think you told Judge Graber, and he doesn't do so. Does that create a triable issue of fact as to him? I don't believe so. Why not? Because I don't believe that the participation in the review process on an administrative appeal should be the case. But I'm just a reviewer. I'm not liable for this, so I'm not going to act. Your view is that he can't be sued? Yes. My view is you can't create a duty by filing a lawsuit against somebody, and that's what he's trying to do. That's the duty. I file a lawsuit. You look at the record. Therefore, now you're on the lawsuit. Can't the lawsuit serve as knowledge? Serve to give somebody notice of a situation that he thereafter has a duty to react to under his job description? I guess theoretically it could. In this case, it didn't, because the records said if you review the record, it simply says that he's being scheduled for an extraction or and then he turned down the extraction and it gave him ibuprofen and it gave him tetracycline. So I think also he could rely on that medical record that he looked at. The fact that the inmate says he's in pain or anything else doesn't carry the day he looked at the medical record. Let me get back to Dr. Brooks. I'm trying to tie up the answer that you gave to Judge Hurwitz and Judge Graber to the question of whether or not Dr. Brooks could have put him on the – could have given treatment for pain and infection. And you said there's nothing preventing him. There were no resource problems preventing him from doing that. So the question then is what does the instruction dealing with resource limitations do in the case? What is the purpose of the instruction? How is it supported by the record? Because your answer was, yes, he could have done this. This was not a resource limitation. Would it serve some other purpose? I'm just wondering what it's doing in the case. Brooks. Mr. Peralta was arguing that he needed a full-scale cleaning and that he needed – and that he needed – I think that was it, actually. He needed a full-scale cleaning. The medical expert testimony was that there's no treatment for periodontal disease. Mr. Peralta argued that he also needed to have his cavities filled. That was the other thing. There's no evidence in the record, as far as I could glean, that he had other than perhaps one small cavity while at Lancaster. But that was certainly disputed. That was all presented to the jury. Was an argument made on Mr. Peralta's behalf, if you know, that staffing resources really had nothing to do with Dr. Brooks' ability to order a greater level of care? So setting aside the fact that, yes, there was this jury instruction number 24 given, that's not factually the issue in this case, and you, the jury, need to consider the fact that Dr. Brooks was still in a position to order this greater level of care, and he didn't do so, therefore, he was deliberately indifferent. Arguments made along those lines? That argument was made repeatedly. It started in the opening statement. It's on volume 1, pages 22 and 23. It was made in the closing repeatedly, that once he was in the chair, he should have been treated. That was the defense position. The defense position, I'm sorry, the plaintiff's position, they stated, we don't dispute that there was a shortage of staff. We believe, you know, we're not going to dispute that. We believe that he should have treated him when he was in the chair. So, yes, that argument was made throughout the trial. That was the plaintiff's argument. So it seems to me that this instruction that staffing resources was at issue seemed fairly extraneous to the primary arguments being advanced in the case. I don't know that it was extraneous. I think if Dr. Brooks, in an ideal world, when Mr. Peralta comes in and says, you know, my teeth hurt, and Dr. Brooks would say, oh, well, let me, let me x-ray them all, and let me clean them, and let me evaluate you, and that's what we didn't have. We don't have that kind of fullness of time. So it wasn't extraneous. The fact that he's in the chair, I think one of the justices pointed out that, you know, you have to make choices now between other people you're going to treat. It's a Hobson's choice. How do you do that? Youngberg says, one of the things they say in their opinion is that you have to employees, the administrators, and particularly professional personnel, should not be required to make each decision in the shadow of an action for damages. But my difficulty with this case is looking at the record, and that's where I need your help on it. I can't find any place where Dr. Brooks said, I would have done this differently had I had more resources. Did he ever say that? I thought his defense was, I did the right thing. I saw him. I saw him. I thought he needed an extraction. Turned out later he didn't, thank God. And in the meantime, I gave him some ibuprofen. Did he ever say, you know, oh, yeah, he needed more, I would have done more, but I didn't have any resources? I don't see that in the record. Is that somewhere? Youngberg, I can't answer that. He testified that Dr. Brooks testified that Mr. Peralta needed urgent care, right? He said I was he did testify that he didn't have enough hours in the day, essentially. He didn't have enough. He was stretched too thin. Yes. Yes, he did testify to that. And maybe, I don't know if he said the words, I would have done something different. But he certainly said, I did the best I could under the circumstances that I had. This is a bad situation. There's not enough dentists. There's your inmates have unique needs. We're just overwhelmed. But there's evidence on the other side that he didn't do the best he could. And I think he told us before he could have prescribed. There were no resource constraints against him prescribing different medication or so I'm having difficulty understanding why this case involves a resource issue. I understand the general notion of a resource issue. I'm having difficulty understanding why this case involves a resource issue. Because you're only focusing on pain medication, and that wasn't the whole case. There were there was this whole issue of periodontal disease, which has little to do with pain medication. But you also, you know, you're suggesting that he should have prescribed more pain medication. The evidence in the record, let me just say. Yeah, but that's the evidence. You may be entirely right. You may have won the case on defense. I'm just trying to figure out why the instruction comes in. But let me just clarify this. Mr. Peralta testified that the ibuprofen reduced his pain dramatically, and he never came back for more. If you don't come back for more, what's the doctor doesn't know that what he gave him wasn't good enough? Again, you're telling me why you won the case. I think you win it every time you try it. That's not my question. My question is, therefore, why are resources part of the issue? Surely you didn't run out of ibuprofen. Because the resources went to the cavity issue, and they went to the periodontal cleaning issue. It didn't just go to pain medication. There were three. Mr. Peralta said, I have cavities that are unfilled. That's what his expert testified to. They were causing him some pain. He said, I need a teeth cleaning, because that's how you treat periodontal disease. Now, work with me on this. Did Dr. Brooks say, yes, I would have done that stuff sooner, or I would have done it had I had more resources? I thought he said, now you're wrong. He didn't need that stuff. I don't think he said, now you're wrong. I don't think he did. I think he – I don't know if he ever actually came out and said, I would have done this differently. But he certainly said, I was doing the best I can. There wasn't enough resources. Oh, I understand. I'm sorry. I can't answer the question. There's nothing in this record that suggests that – that had – that with more resources or less resources, he would have pursued a different course of treatment, is there? Well, wasn't that the – wasn't that the explanation for why he wasn't being seen sooner? He was put down on the list because they didn't have – there were too many people ahead of him? Yes. How did this instruction get into the case? Do you know where it was first proposed? I do. The Plaintiffs' Counsel proposed the converse of this instruction. The first sentence of which was ultimately the same as what the Court delivered, that is, that there is evidence about resources and staffing. Yes. And then the Judge Selna just reversed the instruction. He said, that's wrong. Staffing constraints are an important part of the case, and that should go to the jury. That's how it came about. So it was – it was proposed completely differently than it ended up. So the instruction came from the trial court? Yes. Yes. Let me just briefly say something about the indemnification issue. And I appreciate the Court's concern that other States don't indemnify. But I think it's also really important to keep in mind the fact that there's not an automatic indemnity for punitive damages. It has to – it's in the sole discretion of the State. Frankly, it could be at the whim of the State. For any reason, they could say, we're not going to indemnify. A huge component of that, however, in my opinion, is reputation. That's a protected right under the California Constitution. The United States Supreme Court has said it's a really valuable right. So if you say, well, you can sue the doctor and recover against the doctor for deliberate indifference, that goes to his reputation. He – when he leaves the facility – indifferent, why would we protect his reputation or her reputation? You – but the – I'm saying he's not deliberately indifferent because he doesn't have the resources. Therefore, he doesn't have the subjective state of mind. So he's not deliberately indifferent. This is a rebuttal to the Prima Facie case. So the problem I have is, you know, when he goes to get another job, it affects his malpractice insurance. It affects his ability to get a job. I mean, if I said to you, well, I'm going to sue you because you don't write your case, and you're going to win, but the State's going to pay, don't worry, that's – that's – that's a big deal. Our reputations are everything, not only in the law, but in the medical profession. So I think the whole indemnity argument is just an unfair one to suggest that the doctors should be happy to be indemnified. I think you would lose people. Why would anyone want to work for the State if you're going to get sued for that? And we know – we know from Brown v. Plata that it's hard to get people to work for the State in the prison system. Let me get back to Dillard, the two defendants who were dropped out on what is J-Mal? They were dropped out before the jury – went to the jury. Yes, sir. Is there any argument that – let's say we were to affirm on Brooks, would any error as to the other two be harmless? Yes. On the theory that – on the theory that if the primary care physician isn't – or dentist, rather, the primary care dentist is properly found not liable, then his superiors wouldn't be either. Yes. I think that's exactly right. I think that would be the necessary outcome. You want to donate your two and a half minutes to that aside? Yes. Very well. I'd be delighted. Thank you. I think that gives you a total of four minutes, if you want to take it. Thank you. First, I'd like to quickly respond to Chief Judge Kaczynski's question. The answer to that question – I have many questions. Well, the one that you just asked opposing counsel. We are not seeking liability against Dillard and Fitter on the basis of their supervisory control of Dr. Brooks. It independently violated Mr. Peralta's rights, and that's by refusing to reply from a request from Mr. Peralta. So whether or not – But we have to make some judgment in determining harmless error is, well, okay. Let's say that this Court erred. Had this gone to the jury, is there any possibility that – let's say we uphold the – I have no idea what we'll do. So let's just assume that we affirm that based on these instructions. Don't we then have to ask the question, is there any way the jury could have found for Brooks but against Dillard and the other guy? And the answer is yes. So it could be that – Tell us how. Because the jury could have found, if you uphold the jury instruction, that Brooks was constrained by his resources. However, Dillard and Fitter, being the chief dental officer and the chief medical officer, had the ability to put Mr. Peralta on a higher priority list. And where is that evidence that they had more power to do that? Well, I think each of them testify – testified as to what the role of the Level 2602 appeal was. And it was either grant, conduct further interviews, or deny. And when you grant, what that means is you put them on the list and you say, hey, guess what, you get treated. They had the ability to do that. So whether or not Mr. Brooks was totally constrained from providing – They can't go out and get more resources. They can't get more money, right? Yes. They're still subject to the same set of resources as – they can just reallocate – they can shuffle the – the chairs on the Titanic, right? That's what they can do. Yeah. Well, that's absolutely right. They can't save the boat. Well, they can save – when the boat is Mr. Peralta, they certainly can save him, because they – Counsel, this is confusing. You're talking about granting a 602 appeal and putting them on the list, and you're not distinguishing. There's two lists, right? They would have moved into the urgent care list as opposed to the routine care list. Isn't that the point? Exactly. I'm going to make sure I understand your argument quickly, because now you're confusing me. I'm sorry. What I'm saying is Dillard and Fitter had the opportunity to place Mr. Peralta on the emergency or urgent care list. And Brooks didn't? Well – I'm asking a question. Well, I think he – I think he did, but if you're going to – Okay. So if they say – if you did, and the jury says he's not liable, how can they hold Dillard? How would they hold Dillard and the other guy – Fitter, sorry, Fitter liable for not doing the very thing they held Brooks was not liable for not doing? Well, I don't think the testimony at all supports the idea that Brooks – the problem is there shouldn't be this discussion about resources. As we've heard, Brooks was – I understand. But you – just assume you lose on that. So I know it's a tough thing, so – but you've got 49 seconds. I understand. It's hard to – Dr. Brooks, I don't buy that he didn't have the resources. But it's possible that he didn't have the resources because he had to see urgent, emergency, and routine. But Dillard and Fitter could have said, you are emergency. You get treated now. I'd like to quickly respond to a couple of questions from Judge Hurwitz. First of all, Dr. Dillard didn't just review the appeal form. He reviewed Mr. Peralta's complete dental record. What did Dr. Dillard do wrong before the service of the complaint? Well, there's – there's disputed testimony. She says that he didn't see the form, but the jury should have been permitted to draw the inference that he did. He said that he sometimes authorized people to sign on his behalf, though he shouldn't have. His name was on the line. The jury should have been permitted to decide, after both sides had presented their cases, whether or not he may have seen that appeal and denied Mr. Peralta care. Thank you. Thank you. The case is arguably stand-submitted. We'll adjourn.
judges: Kozinski, Silverman, Graber, Tallman, Rawlinson, Clifton, Bybee, Smith, Christen, Nguyen, Hurwitz